UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -:
ILEEN CAIN,                           :     13 Civ. 7834 (JCF)
                                      :
            Plaintiff,                :         MEMORANDUM
                                      :        AND   ORDER
      - against -                     :
                                      :
ATELIER ESTHETIQUE, ANNETTE HANSON,:
INC., MS. MICHELLE, MS. CHRISTINE,  :
MS. ANN, MS. KERA, MR. ROCHESTER,   :
MS. CHRISTINE, (School               :
Receptionist), SCHOOL ACCOUNTANT    :
ANNETTE HANSON,                      :
                                      :
            Defendants.               :
- - - - - - - - - - - - - - - - - -:

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

```
USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 4/20/16
```

        Pro se plaintiff Ileen Cain brings this action against Atelier

Esthetique  Institute  of  Esthetics,  Inc.  ("Atelier"),  alleging

defamation  and  discrimination  under  Section  504  of  the

Rehabilitation Act, 29 U.S.C. § 794 (the "Rehabilitation Act"),

and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-

107 (the "NYCHRL").  The defendant has moved to amend its answer

to assert additional affirmative defenses and for summary judgment

on each of the plaintiff's claims.  For the reasons that follow,

the motion is granted in part.

1

Background[1]

In November 2012, Ms. Cain applied for admission to Atelier's "600-Hour Esthetics program leading to licensure as an Esthetician in New York State." (Def. 56.1, ¶ 7; Letter of Kyra Svetlovsky dated Nov. 9, 2012, attached as Exh. K to Declaration of Nicole Feder dated Jan. 29, 2016 ("Feder Decl.")). The plaintiff indicated in her application that she was receiving Social Security Disability ("SSD") benefits, though she did not disclose the nature of her disability.[2] (Def. 56.1, ¶ 8). She attended her first

---

[1] The plaintiff has not filed a responsive statement of undisputed facts as required under Local Civil Rule 56.1(b); however, as will be discussed below, a court "may in its discretion opt to 'conduct an assiduous review of the record' even where one of the parties has failed to file such a statement." Holtz v. Rockefeller & Co., 258 F.3d 62, 73 (2d Cir. 2001) (quoting Monahan v. New York City Department of Corrections, 214 F.3d 275, 292 (2d Cir. 2000)). The following background is derived from the defendant's Statement Pursuant to Local Rule 56.1 ("Def. 56.1") except where otherwise noted.

[2] The plaintiff asserts that she informed Ronald Cary Rochester, Atelier's former School Director, that "she was receiving SSD due to the murder of her son." (Plaintiff['s] Opposition to Defendant['s] Motion For Summary Judgment ("Pl. Memo.") at 16). During her deposition, Ms. Cain described a conversation with Mr. Rochester in which she "described in detail the situation that [she] was going through," told him "all about [her] son's murder [and] how [she] was diagnosed with PTSD," and "inform[ed] him [] that [she was] a victim of cyber-stalking." (Deposition of Ileen Cain ("Cain Dep."), attached as Exh. D to Feder Decl., at 150-52, 275). Ms. Cain further stated that she "made [Mr. Rochester] aware" that she was receiving services from the New York State Education Department's Adult Career and Continuing Education Services-Vocational Rehabilitation ("ACCES-VR") program (formerly known as Vocational and Educational Services for Individuals with Disabilities or "VESID"). (Cain

class on December 5, 2012.  (Def. 56.1, ¶ 11).  On December 14, 2012, the plaintiff was discharged from the school.  (Def. 56.1, ¶¶ 24, 26).  The parties offer divergent accounts of what transpired between December 5 and 14.

Ms. Cain testified that, after her first day at Atelier, she had to miss a day of classes because of an inspection taking place at her apartment.  (Cain Dep. at 135, 233-34).  When she returned to class, "everything changed."  (Cain Dep. at 157).  The plaintiff overheard other students mocking her and calling her names like "kooka," "mokara," "cuckoo," "cooky," and "pookey." (Cain Dep. at 161, 234, 239).  This harassment was "continuous." (Cain Dep. at 161).  Having previously been told that Mr. Rochester handled harassment and bullying complaints, Ms. Cain went to him

---

Dep. at 151-52; Affidavit of Ruby Jackman dated Jan. 7, 2016, ¶¶ 1, 3).  Mr. Rochester denies discussing with Ms. Cain her SSD benefits or her disability.  (Response to Plaintiff's Interrogatories/Deposition via Written Questions to Ronald Cary Rochester dated Dec. 16, 2015 ("Rochester Interrog."), attached as Exh. E to Feder Decl., ¶ 4).

An administrative law judge for the Social Security Administration determined that the plaintiff was entitled to SSD benefits, finding that she suffered from "schizoaffective disorder," "post[-]traumatic stress disorder (PTSD)," and "paranoid personality disorder." (Social Security Administration Office of Disability Adjudication and Review Decision, attached as part of Exh. W to Affirmation of Ileen Cain dated March 8, 2016 ("Cain Aff."), at 1, 5-6).  The plaintiff, however, testified that her disability is limited to PTSD and that there is nothing that she is presently "unable or incapable of doing" due to her PTSD. (Cain Dep. at 30-31).

and reported the students' behavior and the names they were calling her. (Cain Dep. at 163, 165; Rochester Interrog., ¶ 3). Mr. Rochester responded that "it's not like this hasn't happened here before," and told the plaintiff "he would investigate," asking for the names of the students who were bullying her. (Cain Dep. at 166-67, 169). Ms. Cain stated she did not know their names. (Cain Dep. at 167). The plaintiff referred to the interaction as a "good conversation" and indicated that Mr. Rochester gave "no indication that [she] would be terminated." (Cain Dep. at 169).

A day or so later, Ms. Cain's instructor pulled her out of class and informed her that Mr. Rochester wanted to speak with her. (Cain Dep. at 179). The plaintiff met with Mr. Rochester and Ann Marie Pandullo, a financial aid officer at Atelier, in the financial aid office. (Cain Dep. at 179; Response to Plaintiff's Interrogatories/Deposition via Written Questions to Ann Marie Pandullo dated Dec. 7, 2015 ("Pandullo Interrog."), attached as Exh. G to Feder Decl., ¶ 6). Mr. Rochester told Ms. Cain that he had contacted Mark Weinstein, the director of the Brooklyn ACCES-VR office, that she was being terminated from Atelier, and that she should contact ACCES-VR. (Cain Dep. at 180-81). When the plaintiff asked why Atelier was terminating her, Mr. Rochester again stated that she should contact ACCES-VR, and stated that she was exhibiting "signs of [] delusion or hallucination." (Cain

Dep. at 181, 227).[3]   Although she was present throughout the encounter, Ms. Pandullo did not speak during the meeting.  (Cain Dep. at 181; Def. 56.1, ¶ 27).  After the conversation, which lasted about ten minutes, Ms. Cain retrieved her belongings and left the building.  (Cain Dep. at 183-85).

According to Mr. Weinstein, Mr. Rochester called him on December 14, 2012, the day Ms. Cain was terminated. (Chronological Case History/Important Events Case Note dated Dec. 14, 2012 ("12/14/12 Case Note"), attached as Exh. O to Cain. Aff.). Mr. Rochester "advis[ed] that [Ms.] Cain was hearing voices and acting paranoid."  (12/14/12 Case Note).  He further stated that Ms. Cain had mentioned ACCES-VR and that he believed ACCES-VR had "sent" her to Atelier.  (12/14/12 Case Note).  Based on his belief that Ms. Cain was "showing clear signs of not being able to get through the program," Mr. Rochester was reluctant to begin charging her tuition and planned to "terminate her as gently as he could." (12/14/12 Case Note).

The defendant states that, after Ms. Cain began attending

---

[3] Ms. Cain's testimony regarding whether Mr. Rochester mentioned delusions or hallucinations when he terminated her was ambiguous.  At one point, she testified that Mr. Rochester said "[Y]ou [are] already showing signs of like delusion or hallucination."  (Cain Dep. at 227).  Later she suggested that he either (1) said "delusion" or "hallucination" under his breath or (2) stopped himself before he vocalized these words.  (Cain Dep. at 227-29).

classes, one of her instructors, Christine Anderson, complained to Mr. Rochester about the plaintiff's behavior. (Def. 56.1, ¶¶ 13-16).[4]  Ms. Anderson asserts that "[she] observed [Ms. Cain] talking to the wall or to herself," that Ms. Cain "would speak to herself during class," that "she had outbursts in class that had nothing to do with the course material," and that "several of Ms. Cain's classmates approached [Ms. Anderson] . . . to express some of these same concerns." (Response to Plaintiff's Interrogatories/Deposition via Written Questions to Christine Anderson dated Dec. 14, 2015 ("Anderson Interrog."), attached as Exh. F. to Feder Decl., ¶ 5). Ms. Anderson spoke to Mr. Rochester about Ms. Cain "a few times," describing to him the behavior she observed and reporting that other students had approached her about Ms. Cain. (Anderson Interrog., ¶¶ 5-7). On December 14, 2012, "several" unidentified students "advised" Ms. Anderson that, during a break from class, they had been discussing the shooting at Sandy Hook Elementary School -- which had occurred earlier that day -- when Ms. Cain stated to them "that she was going to do that to some of the students at Atelier and that she could do it better

---

[4] The only other instructor Ms. Cain had during her time at Atelier, Michele Racioppi, indicated that she does not remember Ms. Cain being in her class or anything about the events in question. (Def. 56.1, ¶ 13; Response to Plaintiff's Interrogatories/Deposition via Written Questions to Michele Racioppi, attached as Exh. A to Cain Aff., ¶¶ 4-25).

than the Sandy Hook shooter." (Anderson Interrog., ¶ 9). Ms. Anderson immediately told Mr. Rochester what the students had told her. (Anderson Interrog., ¶ 9).

Before dismissing Ms. Cain on December 14, Mr. Rochester had conversations with her on December 12 and 13 regarding her allegations that she was being harassed by other students. (Rochester Interrog., ¶ 3). On both occasions, the plaintiff asked Mr. Rochester to contact the police but refused to identify her harassers. (Rochester Interrog., ¶ 3). Mr. Rochester sat in on one of the plaintiff's classes but "did not observe [her] being bullied or bothered by the other students." (Rochester Interrog., ¶ 3). However, he did observe her "angrily talking to the walls in class or in the hallway when no one was around." (Rochester Interrog., ¶ 3). Moreover, "[s]everal [unidentified] students came to [him] to complain about Ms. Cain's behavior and threatening, aggressive statements." (Rochester Interrog., ¶ 15). During their second conversation, Mr. Rochester "suggested that [Ms. Cain] might benefit from counseling"; Ms. Cain responded that she did not need counseling and stated that she "knew what to do with them" and "knew how to handle people like that," referring, presumably, to the students about whom she was complaining. (Rochester Interrog., ¶ 3).

Mr. Rochester acknowledges calling Mr. Weinstein on December

14 in order to "refer Ms. Cain back to ACCES-VR for services because Ms. Cain exhibited threatening, intimidating[,] and aggressive behavior." (Rochester Interrog., ¶ 13). He further states that Mr. Weinstein informed him that "Ms. Cain had a history of limited success with education institutions due to personal issues" and that he does not remember "whether [he] stated to Mr. Weinstein that Ms. Cain was 'hallucinating and delusional.'" (Rochester Interrog., ¶ 13). Regarding his conversation with Ms. Cain on December 14, Mr. Rochester asserts that he spoke with her about "her behavior in class" and "explained that she was being disruptive in class and that it was having a negative impact on the education of the other students." Ms. Cain "yelled" that "they" had "gotten to [him]" and suggested that she was being punished for complaining about bullying. (Rochester Interrog., ¶ 3). She then repeated "in a very disturbing tone of voice" the statement that she knew how to "take care of" and "deal with" the bullies and left Mr. Rochester's office. (Rochester Interrog., ¶ 3). Ms. Pandullo, who was present when Mr. Rochester terminated Ms. Cain, remembers that "Mr. Rochester stated over and over again that Ms. Cain was being terminated from the school" and that Ms. Cain responded by "repeatedly ask[ing] [him] why she was being terminated." (Pandullo Interrog., ¶¶ 6, 10). After Ms. Cain left the office, Mr. Rochester "explained to [Ms. Pandullo] that Ms.

8

Cain had been terminated because students and teachers expressed concern over her behavior and things she had said." (Pandullo Interrog., ¶ 15).[5]

According to Mr. Rochester, he terminated the plaintiff because (1) she refused to identify the students harassing her; (2) she made statements about knowing how to "deal with" and "take care of people like that" in a threatening and intimidating manner, causing him concern for the safety of Atelier's students and staff; (3) she had an "aggressive and frightening" demeanor when speaking with him; (4) other students complained about her speaking "angrily or in [] an agitated manner" to herself or to the walls; and (5) her instructors "spoke with [him] about Ms. Cain's behavior." (Rochester Interrog., ¶ 10).[6]

Following her discharge, the plaintiff filed a complaint with the U.S. Department of Education's Office for Civil Rights ("OCR"). (Def. 56.1, ¶ 31; Cain Dep. at 190; Letter of Timothy C. J.

_____

[5] Neither Mr. Rochester nor Ms. Pandullo mentioned Ms. Cain's alleged statements about the Sandy Hook shooting in their interrogatory responses.

[6] Ms. Cain denies engaging in the behavior that the defendant claims led to her termination. (Affirmation of Ileen Cain dated April 21, 2014 ("Cain 4/21/14 Aff."), at 5-6). Specifically, she denies disrupting class or confronting classmates, speaking to herself, stating that she knows how to take care of people who bully her, and acting aggressively or threateningly. (Cain 4/21/14 Aff. at 6). Moreover, Ms. Cain denies that Mr. Rochester, prior to her termination, spoke to her regarding concerns with her behavior. (Cain 4/21/14 Aff. at 5-6).

Blanchard dated June 14, 2013 ("Blanchard Letter"), attached as Exh. M. to Feder Decl., at 1).  Ms. Cain alleged that Atelier discriminated against her on the basis of her disability by dismissing her on December 14 after she disclosed having previously received services from ACCES-VR.  (Blanchard Letter at 1).  The complaint also described the conversation between Mr. Rochester and Mr. Weinstein and Mr. Rochester's remarks about the plaintiff hallucinating and being delusional.  (Blanchard Letter at 2). After OCR "reviewed documentation [Ms. Cain] and [Atelier] submitted" and interviewed Ms. Cain, Atelier entered into a voluntary resolution agreement with OCR, thereby resolving Ms. Cain's complaint.  (Blanchard Letter at 1, 3).  The agreement provided that Atelier would (1) offer to have the plaintiff reenroll or, if the plaintiff declined that offer or failed to act, (2) refund to the plaintiff "all tuition and fees," and (3) "provide training" to its administrators regarding "the requirements of [the Rehabilitation Act]."  (Resolution Agreement, attached as part of Exh. F to Cain Aff.).  Atelier subsequently wrote Ms. Cain a check for $1,286, which she cashed.  (Check dated Aug. 1, 2013, attached as Exh. N to Feder Decl.; Cain Dep. at 290-91).  A memo on the face of the check read, "In full satisfaction of all claims by I. Cain against Atelier," language that the plaintiff acknowledges having seen and understood.  (Check; Cain

10

Dep. at 292-93).  By September 30, 2013, OCR determined that Atelier had complied with all of the resolution agreement's terms. (Letter of Timothy C. J. Blanchard dated Sept. 30, 2013, attached as part of Exh. F. to Cain Aff., at 1-2).

After filing her complaint with OCR, Ms. Cain reached out to the Center for Independence of the Disabled - New York ("CID-NY"), an advocacy organization where she had previously received services.  (Cain Dep. at 76, 222).  CID-NY "immediately started advoca[ting]" and making calls to Atelier on the plaintiff's behalf.  (Cain Dep. at 222).  On January 15, 2013, in the presence of the plaintiff, Paula Wolff, a supervisor at CID-NY, spoke to Mr. Rochester on the phone.  (Cain Dep. at 222-23; Letter of Paula Wolff dated Jan. 15, 2013 ("Wolff Letter"), attached as part of Exh. Z to Cain. Aff.; Def. 56.1, ¶ 29).  During that conversation, Mr. Rochester indicated that he was reluctant to meet with the plaintiff and Ms. Wolff and stated "that [he] could not afford to have students who hallucinate in class."  (Wolff Letter; Cain Dep. at 222-23; Def. 56.1, ¶ 30).  Mr. Rochester also stated that he had spoken with ACCES-VR regarding the plaintiff.  (Wolff Letter).[7]

---

[7] Mr. Rochester acknowledges that he received a call, made on the plaintiff's behalf, from an advocacy organization, though he does not remember the caller's name.  (Rochester Interrog., ¶ 19). During the call, Mr. Rochester says he discussed "Ms. Cain's behavior," including her being aggressive and threatening toward other students, her outbursts in class, and her talking to herself; he "may have also said that both teachers and students complained

Procedural History

The plaintiff filed this action on November 4, 2013. After the Court dismissed sua sponte the plaintiff's claims against the individual defendants (Order dated Nov. 26, 2013, at 2), Atelier moved to dismiss the remaining claims (Notice of Motion dated April 11, 2014). On June 26, 2014, I recommended granting the defendant's motion without prejudice to the plaintiff filing an amended complaint that named the appropriate defendant and "identif[ied] the disability that she alleges [the defendant] regarded her as having." (Report and Recommendation dated June 26, 2014 ("6/26/14 R&R"), at 14). Before the Honorable George B. Daniels, U.S.D.J., could issue a decision on the Report and Recommendation, Ms. Cain filed an amended complaint on July 8, 2014.

The defendant again moved to dismiss the plaintiff's claims pursuant to Rule 12(b)(6) or, in the alternative, for summary judgment pursuant to Rule 56. (Notice of Motion dated July 29, 2014). With regard to this second motion, I recommended that Judge Daniels (1) dismiss the plaintiff's claims under the Americans with Disabilities Act (the "ADA"), the New York State Human Rights Law, N.Y. Exec. Law § 290 et seq., and the New York Civil Rights Law, N.Y. Civ. Rights Law §§ 40-c, 40-d; (2) convert

---

about Ms. Cain's behavior." (Rochester Interrog., ¶ 19).

the defendant's motion to dismiss to a motion for summary judgment for the plaintiff's remaining claims; (3) grant summary judgment for the defendant as to plaintiff's claims of aiding and abetting and retaliation under the NYCHRL; and (4) deny the defendant's motion for summary judgment as to the plaintiff's claims for defamation and discrimination under the Rehabilitation Act and the NYCHRL. (Report and Recommendation dated Oct. 29, 2014 ("10/29/14 R&R"), at 34). Judge Daniels accepted each of these recommendations. Cain v. Atelier Esthetique Institute of Esthetics, Inc., No. 13 Civ. 7834, 2015 WL 1499810, at *2-3 (S.D.N.Y. March 27, 2015). The parties subsequently consented to my jurisdiction for all purposes pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure. (Notice, Consent, and Reference of a Civil Action to a Magistrate Judge dated May 28, 2015). Following the close of discovery, the defendant filed this motion.

Legal Standard

   A.  Rule 56

   Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment shall be granted where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Johnson v. Killian, 680 F.3d 234, 236 (2d Cir. 2012) (per curiam). The moving

13

party bears the initial burden of identifying "the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). A fact is "material" if it "might affect the outcome of the suit under governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The movant may discharge this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

If the movant meets this initial burden, the opposing party then must come forward with "specific facts showing that there is a genuine issue for trial." Id. at 324 (quoting former Fed. R. Civ. P. 56(e)). In assessing the record to determine whether there is a genuine issue of material fact, the court must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party. Anderson, 477 U.S. at 255; Johnson, 680 F.3d at 236. But the court must inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party" and grant summary judgment where the nonmovant's evidence is conclusory, speculative, or not significantly probative. Anderson, 477 U.S at 249-50. "The

14

litigant opposing summary judgment may not rest upon mere conclusory allegations or denials, but must bring forth some affirmative indication that his version of relevant events is not fanciful." Podell v. Citicorp Diners Club, Inc., 112 F.3d 98, 101 (2d Cir. 1997); see also Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts"). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (quoting First National Bank of Arizona v. Cities Service Co., 391 U.S. 253, 288 (1968)).

On a motion for summary judgment, a pro se litigant's submissions should be liberally construed "to raise the strongest arguments that they suggest." Buffaloe v. Fein, No. 12 Civ. 9469, 2014 WL 1224446, at *2 (S.D.N.Y. March 20, 2014) (quoting McPherson v. Coombe, 174 F.3d 276, 280 (2d Cir. 1999)). Proceeding pro se, however, does not "relieve [a plaintiff] from the usual requirements of summary judgment." Cayemittes v. City of New York Housing Preservation & Development, 974 F. Supp. 2d 240, 257 (S.D.N.Y. 2013). As a result, if a pro se party does not provide some evidence in support of her allegations, the motion will be granted. See id.

B.  Local Civil Rule 56.1

Local Civil Rule 56.1(a) requires a party moving for summary judgment to annex to its motion a "separate, short and concise statement, in numbered paragraphs, of the material facts as to which [it] contends there is no genuine issue to be tried."  In addition, where a party seeks summary judgment against a pro se litigant, that party must provide the pro se litigant with notice of the requirements of both Rule 56 and Local Civil Rule 56.1. Local Civ. R. 56.2.  Local Civil Rule 56.1(b) demands that the party opposing summary judgment provide "correspondingly numbered paragraph[s] responding to each numbered paragraph in the statement of the moving party."  Each numbered paragraph in the moving party's 56.1(a) statement will be deemed admitted unless controverted by the nonmoving party's 56.1(b) statement.  Local Civ. R. 56.1(c).  Pro se litigants who receive proper notice pursuant to Local Civil Rule 56.2 are not excused from satisfying their obligations under Local Civil Rule 56.1. Allen v. City of New York, 480 F. Supp. 2d 689, 703 (S.D.N.Y. 2007).

The defendant here gave the plaintiff notice of her obligations concerning summary judgment.  (Notice to Pro Se Litigant Who Opposes a Motion for Summary Judgment dated Jan. 29, 2016).  The plaintiff, however, has not submitted a responsive Local Rule 56.1 statement.  Nevertheless, the Court may not rely

16

solely on the statement of undisputed facts contained in the moving party's Local Rule 56.1 statement, but must be satisfied that the citation to evidence in the record supports the moving party's assertions.  Vermont Teddy Bear Co. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004).  Where the court's independent review of the record yields evidence contrary to a given assertion in the moving party's Local Rule 56.1 statement, or where a party fails to support an assertion by citing admissible evidence, the court may reject that assertion.  Holtz v. Rockefeller & Co., 258 F.3d 62, 73-74 (2d Cir. 2001).  Conversely, where the moving party's Local Rule 56.1 statement is not contradicted by the court's review of the record, the court may deem the party's assertions admitted as a matter of law.  Franks v. New Rochelle Police Deptartment, No. 13 Civ. 636, 2015 WL 4922906, at *1 n.2 (S.D.N.Y. Aug. 18, 2015).

Because Ms. Cain is proceeding pro se, because summary judgment may not be granted unless a court is satisfied that there is no issue of material fact in dispute, and because the factual record can be reviewed to determine whether there actually are any material factual disputes, I decline to deem the defendants' Local Rule 56.1 statement admitted.  First, "[i]t is well-established that 'when [a] plaintiff proceeds pro se . . . a court is obliged to construe [her] pleadings liberally, particularly when they

allege civil rights violations.'" <u>Hemphill v. New York</u>, 380 F.3d 680, 687 (2d Cir. 2004) (second and third alterations in original) (quoting <u>McEachin v. McGuinnis</u>, 357 F.3d 197, 200 (2d Cir. 2004). Second, "[e]ven when a motion for summary judgment is unopposed, the district court is not relieved of its duty to decide whether the movant is entitled to judgment as a matter of law." <u>Vermont Teddy Bear Co.</u>, 373 F.3d at 242.   Third, a court may, in its discretion, "overlook a party's failure to comply with local [] rules" and consider the entire record.   <u>Holtz</u>, 258 F.3d at 73. Finally, although the plaintiff failed to comply with Local Rule 56.1(b), in opposing the defendant's motion she did provide her own factual account of the case and attached numerous, non-duplicative exhibits.  (Pl. Memo. at 15-22; Cain Aff., ¶¶ 1-31). I will therefore examine the record to determine whether there are any triable issues of material fact, notwithstanding the fact that the plaintiff did not follow Local Civil Rule 56.1.

<u>Discussion</u>

The defendant advances several arguments in support of its motion for summary judgment.  First, the defendant moves to amend its answer to interpose the defense of accord and satisfaction, which it asserts bars all of the plaintiff's claims.  (Memorandum of Law in Support of Motion for Summary Judgment ("Def. Memo.") at 9-10, 23-24).  Next, the defendant asserts that summary judgment

should be granted on Ms. Cain's discrimination claims because (1) she has failed to establish a _prima facie_ case of discrimination and (2) the defendant has shown that she was dismissed for legitimate, non-discriminatory reasons. (Def. Memo. at 17-23). Finally, the defendant argues that the plaintiff's defamation claims fail because (1) the statements do not constitute defamation _per se_ and there is no evidence that the plaintiff suffered special damages, (2) the plaintiff consented to Mr. Rochester's statement to Ms. Wolff, and (3) the statements are true. (Def. Memo. at 11-17).

A.  _Motion to Amend_

Rule 15 of the Federal Rules of Civil Procedure governs motions to amend and provides that leave to amend should be freely granted "when justice so requires." _Agerbrink v. Model Service LLC_, __ F. Supp. 3d. __, __, 2016 WL 93865, at *1 (S.D.N.Y. 2016) (quoting Fed. R. Civ. P. 15(a)(2)). However, leave to amend may be denied where the proposed amendment is futile. _Id._ Moreover, when a party moves to amend a pleading in connection with a pending motion for summary judgment, the issue of futility is properly analyzed pursuant to the more demanding summary judgment standard, rather than the standard governing motions to dismiss. _Republic National Bank v. Hales_, 75 F. Supp. 2d 300, 308-09 (S.D.N.Y. 1999) (noting that "summary judgment standard may be applied [in futility

19

analysis] and leave to amend denied outright should the party seeking amendment fail to satisfy that standard" and collecting cases).[8]

Atelier's proposed amendment is futile because it has failed to establish the elements of its accord and satisfaction defense.[9] As the defendant points out, the plaintiff acknowledges having read and understood the statement "In full satisfaction of all claims by I. Cain against Atelier," which was written on the check the defendant sent her, though she believed the check represented "reimburse[ment] for the enrollment for the fees."   (Cain Dep. at 292-94, 355).   What the defendant does not mention is that this refund was made pursuant to its resolution agreement with OCR.

"As a general rule, acceptance of a check in full settlement of a disputed unliquidated claim operates as an accord and satisfaction discharging the claim." Merrill Lynch Realty/Carll Burr, Inc. v. Skinner, 63 N.Y.2d 590, 596, 483 N.Y.S.2d 979, 982

---

[8] In fact, "[w]here an amended claim would fail on a summary judgment motion, the court has discretion to treat the opposition to the amendment as a motion for summary judgment and to consider matters outside the pleadings in resolving the motion." Schare v. Six Flags Theme Parks, No. 96 Civ. 9377, 1998 WL 24361, at *6 (S.D.N.Y. Jan. 23, 1998).

[9] The defendant also moves to amend its answer to plead the defense of truth as to the plaintiff's defamation claims.   As explained below, the defendant's motion for summary judgment on the defamation claims is granted, rendering this proposed amendment moot.

(1984).  However, "[t]he payment of an admitted liability is not a payment of[,] or consideration for, an alleged accord and satisfaction of another and independent alleged liability."  Hudson v. Yonkers Fruit Co., 258 N.Y. 168, 173 (1932) (quoting Manse v. Hossington, 205 N.Y. 33, 36 (1912)).  This is because the payment of an undisputedly owed amount "furnishes no consideration for the [] relinquishment or extinguishment" of an independent claim.  Famous Music Corp. v. Seeco Records, Inc., 201 F. Supp. 560, 567 (S.D.N.Y. 1961).

In the present case, the plaintiff was the third party beneficiary of the agreement between the defendant and OCR.[10]  Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.,

---

[10] OCR's investigations of civil rights complaints, including alleged violations of the Rehabilitation Act, are governed by 34 C.F.R. §§ 100.6-100.10.  See 34 C.F.R. § 104.61 (applying §§ 100.6-100.10 to Rehabilitation Act investigations).  These procedures provide that "[a]ny person who believes himself or any specific class of individuals to be subjected to discrimination" may file a complaint with OCR.  34 C.F.R. § 100.7(b).  If OCR finds "a possible failure to comply" with the statutes it enforces, it "will make a prompt investigation" to determine "whether the recipient [of federal funds] has failed to comply."  34 C.F.R. 100.7(c).  Where OCR finds that the recipient has failed to comply with the relevant statutes, it will either resolve the matter "by informal means whenever possible" or seek compliance by "the suspension or termination of or refusal to grant or to continue Federal financial assistance or by any other means authorized by law."  34 C.F.R. 100.7(d)(1), 100.8(a).  These procedures are designed to effectuate federal anti-discrimination laws by ensuring compliance among recipients of federal funds, rather than to vindicate an individual complainant's rights.  34 C.F.R. §§ 100.1, 104.1 (describing purpose of relevant regulations); see also Ryan v.

925 F.2d 566, 573 (2d Cir. 1991) ("An intended third party beneficiary will be found when it is appropriate to recognize a right to performance in the third party and the circumstances indicate that the promisee intends to give the third party the benefit of the promised performance."). Pursuant to that agreement, in the event the plaintiff did not accept the

---

Shawnee Mission Unified School District No. 512, 437 F. Supp. 2d 1233, 1254 (D. Kan. 2006) ("[T]he overall thrust of the type of relief afforded by [the regulations] is the denial of federal funding to the funding recipient. . . . [T]his is a public remedy which is an empty one for a private plaintiff . . . ." (internal citation omitted)).

OCR's Case Processing Manual (the "CPM") describes a procedure for resolving a complaint during the pendency of an investigation. U.S. Department of Education, Office for Civil Rights, Case Processing Manual § 302 (2015), http://www2.ed.gov/about/offices/list/ocr/docs/ocrcpm.pdf. That procedure is triggered only when "the recipient expresses an interest in resolving the allegations"; the complainant plays no role and only receives notice "of the recipient's interest in resolution." Id. Indeed, the CPM characterizes the process as a negotiation only between OCR and the recipient. Id. At her deposition, Ms. Cain stated that she believed OCR was still investigating her complaint when she received notice that OCR and Atelier had entered into a resolution agreement. (Cain Dep. at 288-90. In sum, there is no indication that Ms. Cain participated in the resolution of her OCR complaint or negotiated to release any claims against Atelier. Cf. Shirey ex rel. Kyger v. City of Alexandria School Board, 229 F.3d 1143 (Table), 2000 WL 1198054, at *3-4 (4th Cir. Aug. 23, 2000) ("The right to file a disability discrimination claim under the Rehabilitation Act . . . is a statutory right created by Congress. The OCR Agreement cannot bar the instant federal claim unless that agreement contains a knowing and intelligent waiver of the Plaintiff's right to bring such a claim."); see 4th Cir. R. 32.1 (allowing citation of unpublished opinions issued prior to Jan. 1, 2007, if the opinion has value on a material issue and no published opinion would serve as well).

22

defendant's offer to reenroll, the defendant agreed to "refund the [plaintiff] all tuition and fees that it retained, including any applicable book fees, that she previously paid." (Resolution Agreement).   The defendant has offered no evidence to establish any dispute as to the existence or amount of its obligation under this agreement.   Accordingly, the defendant has failed to show that its payment of that liability can operate to extinguish the claims the plaintiff raises in the present action.   The amendment is therefore futile.

   B.   Rehabilitation Act

   The Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in . . . or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).   To state a prima facie claim under the Rehabilitation Act, a plaintiff must demonstrate: (1) that she is a qualified individual with a disability within the meaning of the statute; (2) that the defendant is subject to the Act; and (3) that she was denied the opportunity to participate in the defendant's services, programs, or activities, or was otherwise discriminated against by the defendant, by reason of her disability.   Harris v. Mills, 572 F.3d 66, 73-74 (2d Cir. 2009).

23

A "qualified individual with a disability" is defined as an individual with a disability who "with or without reasonable modifications . . . meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by" the covered entity.   42 U.S.C. § 12131(2); see also McElwee v. County of Orange, 700 F.3d 635, 640 (2d Cir. 2012).  An individual may qualify as "disabled" by showing that she is "regarded as having" a disability.   42 U.S.C. § 12102(1)(C); see also 29 U.S.C. § 705(9)(B) (incorporating ADA's definition of disability, 42 U.S.C. § 12102); Zick v. Waterfront Commission of New York Harbor, No. 11 Civ. 5093, 2012 WL 4785703, at *5 (S.D.N.Y. Oct. 4, 2012).

An individual is regarded as having a disability where she establishes that "she has been subjected to an action prohibited under [the statute] because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity."   42 U.S.C. § 12102(3)(A).   A "mental impairment" under the relevant implementing regulations means "[a]ny mental or psychological disorder, such as an intellectual disability . . . , organic brain syndrome, emotional or mental illness, and specific learning disabilities."  29 C.F.R. § 1630.2(h)(2).

24

The defendant contends that the plaintiff cannot make out a prima facie case of discrimination under the Rehabilitation Act. In support of its contention, the defendant asserts (1) that plaintiff cannot "demonstrate that Atelier regarded [her] as disabled" and (2) that, even if the defendant did regard her as disabled, "there is no evidence to support the claim that she was discriminated [against] based upon the perceived disability." (Def. Memo. at 18-21).   The defendant further argues that it is entitled to summary judgment because the evidence establishes that it terminated the plaintiff for a legitimate, non-discriminatory reason.  (Def. Memo. at 21-23).

As I explained in the June 26 Report and Recommendation, the ADA Amendments Act of 2008 (the "ADAAA") "reinstate[d] the reasoning of the Supreme Court in School Board of Nassau County v. Arline, 480 U.S. 273 (1987)[,] which set forth a broad view of the [regarded as] prong of the definition of [disability] under the Rehabilitation Act."  ADA Amendments Act of 2008, Pub. L. No. 110-325, § 2(b)(3), 122 Stat. 3553 (2008); (6/26/14 R&R at 8-9).  The statute is thus meant to reach those individuals, disabled or not, who might be adversely affected by "society's accumulated myths and fears about disability and disease."  Arline, 480 U.S. at 284; (6/26/14 R&R at 9 ("[T]he amended Rehabilitation Act is meant to protect against 'reflex reactions' by a vocational program like

25

[the defendant's] against a participant like Ms. Cain whom it might
incorrectly perceive as unable to meet the program requirements as
a result of some debilitating impairment." (quoting Arline, 480
U.S. at 283-84))); cf. Hilton v. Wright, 673 F.3d 120, 129 (2d
Cir. 2012) (holding that, in light of ADAAA, to survive summary
judgment plaintiff bringing "regarded as" claim "[is] only
required to raise a genuine issue of material fact about whether
[the defendant] regarded [her] as having a mental or physical
impairment" and need not "present evidence of how or to what degree
[the defendant] believed the impairment affected [her]").

Having already found that suffering from hallucinations
constitutes a "mental impairment" for purposes of being "regarded
as" having a disability (10/29/14 R&R at 18-19 & n.1), I conclude
that there is sufficient evidence to establish that the defendant
regarded the plaintiff as disabled.   The regulation defining
"mental impairment" provides a non-exhaustive list referring to
"[a]ny mental or psychological disorder, such as an intellectual
disability . . . , organic brain syndrome, emotional or mental
illness, and specific learning disabilities."   29 C.F.R. §
1630.2(h)(2); see also Lee v. AT&T Mobility Services LLC, No. 5:11-
CV-294, 2013 WL 1246747, at *6 (E.D.N.C. March 27, 2013) (finding
question of fact existed as to whether plaintiff was regarded as
mentally impaired where defendant speculated that plaintiff

26

experienced hallucinations).   The evidence shows that, on at least two separate occasions, Mr. Rochester stated that Ms. Cain suffered from hallucinations.   (12/14/12 Case Note; Wolff Letter).   The fact that Mr. Rochester himself admits that he "suggested [to the plaintiff] that she might benefit from counseling," also provides some evidence that he perceived her as suffering from mental illness.   (Rochester Interrog., ¶ 3; 12/14/12 Case Note ("Mr. Rochester indicated he had a past career in mental health counseling.   He tried to get the name of a therapist or psychiatrist but [the plaintiff] denied any need for [treatment].")).

The cases the defendant cites are distinguishable.   In <u>Risco v. McHugh</u>, 868 F. Supp. 2d 75 (S.D.N.Y. 2012), the court concluded that an employer's reference to the plaintiff's "erratic" behavior and "her inability to do as task as a 'mental thing'" was insufficient to establish that the employer regarded the plaintiff as disabled.   <u>Id.</u> at 108-09.   Whereas the employer's comments in <u>Risco</u> were vague and isolated, Mr. Rochester's various statements are sufficient to allow a reasonable juror to conclude that he regarded the plaintiff as suffering from hallucinations. In <u>De La Rosa v. Potter</u>, 427 F. App'x 28 (2d Cir. 2011), the Second Circuit affirmed a grant of summary judgment where the "only evidence" that the defendant regarded that plaintiff as disabled

consisted of a "supervisor's signature on a claim for continuation of pay form indicating that [the plaintiff] was 'disabled [from] work.'" Id. at 29 (second alteration in original).[11] This case is different; as explained above, there is ample evidence to establish that the defendant regarded Ms. Cain as disabled.

There is also sufficient evidence to conclude that the plaintiff was terminated from Atelier because of her perceived disability. In arguing that "[i]t defies all logic that Atelier would have discharged [the plaintiff] solely on the basis of her being an ACCES[-VR] consumer," the defendant misconstrues the plaintiff's claim. (Def. Memo. at 20-21). The plaintiff's case is premised on the theory that the defendant terminated her because it (wrongly) regarded her as suffering from hallucinations. To be sure, the defendant's knowledge that the plaintiff received SSD benefits and services from ACCES-VR does not demonstrate that the defendant discriminated against her because of her perceived disability. However, the statements Mr. Rochester made to Mr. Weinstein and Ms. Wolff, along with his interrogatory responses, are sufficient to permit a jury to conclude that the defendant terminated the plaintiff because it believed she suffered from hallucinations. For example, Mr. Rochester's statements to Mr.

---

[11] I also note that De La Rosa applied the Rehabilitation Act as it existed prior to the ADAAA. Id.

Weinstein that Ms. Cain was "hearing voices and acting paranoid," which he interpreted as "clear signs of [her] not being able to get through the program," and that he therefore intended to dismiss her, support Ms. Cain's claim. (12/14/12 Case Note). Similarly, Mr. Rochester's statement to Ms. Wolff that Atelier "could not afford to have students who hallucinate in class" suggests that she was terminated on account of a perceived disability. (Wolff Letter). And while Mr. Rochester denies terminating the plaintiff because he believed she experienced hallucinations, he goes on to cite the fact that other students complained about her speaking "to herself or to the walls" as one reason for dismissing her. (Rochester Interrog., ¶ 10). Taken together, this evidence is sufficient to make out a claim under the Rehabilitation Act.

The defendant contends that, even if the plaintiff has made out a prima facie case of disability discrimination, it is nevertheless entitled to summary judgment because the evidence establishes that it dismissed Ms. Cain for a legitimate, non-discriminatory reason. Courts apply the burden-shifting analysis established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), to assess discrimination claims under the Rehabilitation Act. Roggenbach v. Touro College of Osteopathic Medicine, 7 F.

Supp. 3d 338, 344 & n.2 (S.D.N.Y. 2014).[12]  Under this framework,
once the plaintiff makes out a prima facie case, the burden of
production shifts to the defendant to show "a legitimate, non-
discriminatory reason for the adverse [] action at issue." Glaser
v. Gap, Inc., 994 F. Supp. 2d 569, 572 (E.D.N.Y. 2014).  "If the
defendant is able to do so, the burden shifts back to the plaintiff
to show that the defendant's reason is merely a pretext for the
discrimination." Id.  To prevail on a claim of discrimination
under the Rehabilitation Act, the plaintiff must show that her
disability was the but-for cause of the defendant's
action.  Regional Economic Community Action Program, Inc. v. City
of Middletown, 294 F.3d 35, 49 (2d Cir. 2002), superseded by

---

[12] One could plausibly argue that Mr. Rochester's statements
to Mr. Weinstein and Ms. Wolff constitute direct evidence of
discrimination.  See Redd v. New York State Division of Parole,
923 F. Supp. 2d 371, 385 (E.D.N.Y. 2012) ("'Direct evidence' is
'evidence tending to show, without resort to inference, the
existence of a fact in question.'" (emphasis omitted) (quoting
Tyler v. Bethlehem Steel Corp., 958 F.2d 1176, 1183 (2d Cir.
1992))); Costello v. St. Francis Hospital, 258 F. Supp. 2d 144,
151 (E.D.N.Y. 2003) ("Direct evidence has been defined as 'conduct
or statements by persons involved in the decisionmaking process
that may be viewed as directly reflecting the alleged
discriminatory attitude.'" (quoting Lightfoot v. Union Carbide
Corp., 110 F.3d 898, 913 (2d Cir. 1997))).  Where a plaintiff
produces direct evidence of discrimination, the burden-shifting
framework is inapplicable, as the plaintiff need not rely on the
inference of discrimination created by her prima facie case.  See
Costello, 258 F. Supp. 2d at 151-52.  However, because I reach the
same conclusion regardless of the analytical framework, I will
address the defendant's argument.

statute on other grounds, ADA Amendments Act of 2008, Pub. L. No.
110-325, 122 Stat. 3553; see also Sedor v. Frank, 42 F.3d 741, 746
(2d Cir. 1994) (noting that Rehabilitation Act claim fails where
adverse action "was motivated at least in part by a factor other
than the plaintiff's disability").  "Ordinarily, [the] plaintiff's
evidence establishing a prima facie case and [the] defendant's
production of a nondiscriminatory reason for [the adverse action]
raise a question of fact," thereby precluding summary judgment
except where "the [] nondiscriminatory reason is dispositive and
forecloses any issue of material fact."  Carlton v. Mystic
Transportation, Inc., 202 F.3d 129, 135 (2d Cir. 2000).

     Ms. Cain was dismissed, the defendant asserts, because she
"made intimidating and threatening statements on more than one
occasion[,] including references to the Sandy Hook massacre, she
raised her voice at Mr. Rochester, and she refused to sit and could
not be calmed when he attempted to discuss her conduct with her."
(Def. Memo. at 21).[13]  If credited by a jury, these would indeed
constitute legitimate, non-discriminatory justifications for Ms.

---

     [13] The defendant briefly (and rather vaguely) argues that the
plaintiff was dismissed because she "was incapable of being a
student at Atelier."  (Def. Memo. at 22).  While judicial
deference is owed to the defendant's judgment as to whether the
plaintiff's alleged behavior rendered her unqualified for
participation in its program, Roggenbach, 7 F. Supp. 3d at 345-
46, there is a factual dispute concerning that behavior, which
precludes summary judgment.

Cain's dismissal.   However, while the defendant's evidence is sufficient to create a genuine issue as to whether the plaintiff was terminated "solely by reasons of her . . . disability," it is not dispositive.

In support of its proffered justification for dismissing the plaintiff, the defendant cites the plaintiff's behavior as reported in the interrogatory responses of Mr. Rochester and Ms. Anderson.   (Def. 56.1, ¶¶ 14-16, 20, 22, 24).   However, as indicated previously, Ms. Cain denies having engaged in the conduct Mr. Rochester and Ms. Anderson describe and also denies that Mr. Rochester ever raised concerns with her about her behavior.  (Cain 4/21/14 Aff. at 5-6; Cain Dep. at 178-83).

Moreover, the evidence also reveals inconsistencies in the defendant's version of the events leading up to the plaintiff's dismissal.   Ms. Pandullo, the only other person present when Mr. Rochester dismissed Ms. Cain, indicates (1) that Mr. Rochester did not explain to Ms. Cain why she was being terminated and (2) that Ms. Cain's only response was to "repeatedly ask[] Mr. Rochester why she was being terminated."   (Pandullo Interrog., ¶¶ 6, 10). However, the defendant's response to the plaintiff's complaint with OCR states that during this conversation, when Mr. Rochester referred the plaintiff back to ACCES-VR, she "became upset," "got highly agitated[,] and yelled that [she] 'was not the problem.'"

32

(Letter dated Feb. 20, 2013 ("Def. 2/20/13 Letter"), attached as part of Exh. AA to Cain Aff., at 4-5).   Furthermore, while the defendant's letter suggests that Mr. Rochester decided to dismiss Ms. Cain after she refused to accept services from ACCES-VR, Mr. Weinstein's case note suggests that Mr. Rochester had already decided to terminate Ms. Cain before he "attempted to refer Ms. Cain back to [ACCES-VR]."   (Def. 2/20/13 Letter at 5; 12/14/12 Case Note).   The fact that neither Mr. Weinstein's case note nor Ms. Wolff's letter mentions threatening or aggressive behavior suggests that Mr. Rochester did not raise that issue with them and, therefore, that his decision was not in fact motivated by such behavior.   As for the plaintiff's alleged statement about the Sandy Hook shooting, Mr. Rochester -- the person responsible for dismissing the plaintiff -- does not mention it in describing the reasons for his decision (Rochester Interrog., ¶ 10), and the defendant did not reference it in its letter to OCR (Def. 2/20/13 Letter at 4-5).

Evidence that the plaintiff has a "history of aggressive tendencies and confrontational behavior" does not conclusively establish that the defendant had a non-discriminatory reason for dismissing her.   (Def. Memo. at 22).   Thus, even if this evidence were admissible to show that Ms. Cain engaged in inappropriate

behavior while she was a student at Atelier,[14] the fact remains that there is a dispute on this issue.

---

[14] Rule 404 of the Federal Rules of Evidence provides that "[e]vidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait." Fed. R. Evid. 404(a)(1); see also Fed. R. Evid. 404 advisory committee's note to 2006 amendment ("The Rule has been amended to clarify that in a civil case evidence of a person's character is never admissible to prove that the person acted in conformity with the character trait."). Thus, evidence of an individual's prior acts is inadmissible to establish a propensity for that behavior in order to prove that she engaged in that same behavior on a specific occasion. Hynes v. Coughlin, 79 F.3d 285, 292 (2d Cir. 1996) ("Evidence of other acts is not admissible to prove that the actor had a certain character trait, in order to show that on a particular occasion he acted in conformity with that trait."); 1 Christopher B. Mueller and Laird C. Kirkpatrick, Federal Evidence § 4:40 (4th ed. 2015) ("[P]rior acts are broadly excludable in civil cases, and proof of prior acts should be excluded when they are relevant only because they support a propensity inference."). Thus, to the extent the plaintiff's "history" consists of prior acts, evidence of those acts is inadmissible to establish a propensity for such conduct. See Hynes, 79 F.3d at 292 (finding improper the admission of plaintiff's prison disciplinary records "to show (1) that [the plaintiff] had an aggressive character, and (2) that it was therefore more likely than not that he was the aggressor on the occasions in question").

However, whether evidence of a psychiatric condition constitutes evidence "of a person's character" is "[a] more difficult question." 22B Kenneth W. Graham, Jr., Federal Practice & Procedure Evidence § 5233 (1st ed. 2015) (concluding that "at least some mental traits are to be defined as 'character' under Rule 404"); compare United States v. Staggs, 553 F.2d 1073, 1075 (7th Cir. 1977) (finding that psychologist's testimony that "defendant was more likely to hurt himself than to direct his aggressions toward others" constituted "evidence of a character trait . . . offered to prove that [defendant] acted in conformity with that trait"), overruled on other grounds by United States v. Woody, 55 F.3d 1257 (7th Cir. 1995), and State v. Hallman, 137 Ariz. 31, 35, 668 P.2d 874, 878 (1983) (characterizing expert

A reasonable jury crediting the plaintiff's evidence could conclude that the defendant dismissed her due to her perceived disability; as such, summary judgment is inappropriate.  See Brown v. Board of Education of City of New Britain, 107 F. Supp. 3d 232, 237-38 (D. Conn. 2015) (denying summary judgment where defendant's proferred reasons for termination were "varied" and some evidence "plainly raise[d] the inference that [the plaintiff] was terminated because of a disability"); Sciola v. Quattro Piu, Inc., 361 F. Supp. 2d 61, 66-67 (E.D.N.Y. 2005) (finding sufficient factual dispute to deny summary judgment where plaintiff's and

---

testimony "as to defendant's impulsive personality" and "tendency to act without reflection" as evidence of "character traits"), with United States v. Nixon, 694 F.3d 623, 636 (6th Cir. 2012) (agreeing that "the term 'character trait' does not encompass a witness's memory or mental capacity"), and Bemben v. Hunt, No. 93 C 509, 1995 WL 27223, at *2 (N.D. Ill. Jan. 23, 1995) ("[T]he Court concludes that evidence of Plaintiff's mental condition, such as her 1989 diagnosis of organic delusional disorder with symptoms of paranoid ideations and irrational behavior is not evidence of a character trait and is therefore not excluded by [Rule] 404(a)."); see also Deirdre M. Smith, The Disordered and Discredited Plaintiff: Psychiatric Evidence in Civil Litigation, 31 Cardozo L. Rev. 749, 802 (2010) ("If a personality disorder is associated with manipulative or paranoid behavior, a defendant may hope to use evidence that the plaintiff had such a disorder at the time of the incident in question to suggest that the person was engaging in manipulative and paranoid behavior on that particular occasion. If a court is to admit evidence of the disorder, however, it must be for some ostensibly permissible purpose, rather than for this overt purpose of suggesting that a fact finder infer a particular propensity.").  Because neither party has addressed the admissibility of this evidence in its brief, and because its admission or exclusion does not alter my analysis, I decline to rule on the issue at this time.

35

defendant's accounts of incidents proffered as justification for dismissal differed); cf. Back v. Hastings on Hudson Union Free School District, 365 F.3d 107, 124 (2d Cir. 2004) ("To meet . . . her ultimate burden, the plaintiff may, depending on how strong it is, rely upon the same evidence that comprised her prima facie case, without more."); DeMarco v. Holy Cross High School, 4 F.3d 166, 171 (2d Cir. 1993) (indicating that pretext inquiry may focus on "whether the putative non-discriminatory purpose was stated only after the allegation of discrimination").[15]

C. NYCHRL

Under the NYCHRL, it is an "unlawful discriminatory practice" for

---

[15] The cases the defendant cites -- Fronczak v. New York State Department of Correctional Services, 2 F. App'x 213 (2d Cir. 2001), Siederbaum v. City of New York, 309 F. Supp. 2d 618 (S.D.N.Y. 2004), and Cuff ex rel. B.C. v. Valley Central School District, 677 F.3d 109 (2d Cir. 2012) -- do not alter my analysis. First, Fronczak must be disregarded because the Second Circuit prohibits citations to its summary orders issued before January 1, 2007, except in certain limited circumstances. 2d Cir. R. 32.1.1(b) (Disposition by Summary Order). Furthermore, even where citation to such orders is permissible, they have no precedential effect. 2d Cir. R. 32.1.1(a). Second, in Siederbaum, the court decided the case under the statute as it existed prior to the ADAAA, which (as explained above) imposed a standard for perceived disability claims that no longer applies. See Siederbaum, 309 F. Supp. 2d at 624. Finally, Cuff, which involved a First Amendment claim, asserts that school officials require "wide leeway" in disciplining students for threatening violence. Cuff, 677 F.3d at 114. In this case, summary judgment is inappropriate because there is a factual dispute as to whether, as the defendant claims, the plaintiff was dismissed for threatening violence.

> any place or provider of public accommodation, because
> of the actual or perceived . . . disability . . . of any
> person, directly or indirectly, to refuse, withhold from
> or deny to such person any of the accommodations,
> advantages, facilities or privileges thereof . . . .

N.Y.C. Admin. Code § 8-107(4)(a).  The NYCHRL defines "provider

of public accommodation" to mean "providers . . . of goods,

services, facilities, accommodations, advantages or privileges of

any kind," and defines "disability" as "any physical, medical,

mental or psychological impairment, or a history or record of such

impairment."  N.Y.C. Admin. Code § 8-102(9), (16)(a).  It does not

require a showing that a disability, perceived or actual,

substantially limits a major life activity.  Reilly v. Revlon,

Inc., 620 F. Supp. 2d 524, 541 (S.D.N.Y. 2009).

     Under the NYCHRL, entities such as Atelier are prohibited

from denying "accommodations, advantages, facilities or

privileges" to an individual because of that individual's

perceived disability.  N.Y.C. Admin. Code § 8-107(4)(a).  Contrary

to the defendant's contention, "courts must analyze NYCHRL claims

separately and independently from any federal . . .

claims."  Mihalik v. Credit Agricole Cheuvreux North America,

Inc., 715 F.3d 102, 109 (2d Cir. 2013).  The NYCHRL creates a

lower threshold for actionable conduct and must be construed

liberally in favor of discrimination plaintiffs, meaning that a

defendant may be liable under the NYCHRL but not under state or

federal statutes.  Id. at 109-13; see also Romanello v. Intesa Sanpaola, S.p.A., 22 N.Y.3d 881, 884-85, 976 N.Y.S.2d 426, 428 (2013); Anderson v. Davis Polk & Wardwell LLP, 850 F. Supp. 2d 392, 404 (S.D.N.Y. 2012).  Moreover, in assessing claims brought under the NYCHRL, courts should view similar provisions under federal law as "a floor below which the [NYCHRL] cannot fall." Local Civil Rights Restoration Act of 2005, N.Y.C. Local Law No. 85, § 1 (2005); see also Loeffler v. Staten Island University Hospital, 582 F.3d 268, 277-78 (2d Cir. 2009).

     In light of the similarities between the relevant provisions of the Rehabilitation Act and the NYCHRL, the denial of the defendant's motion for summary judgment on the Rehabilitation Act claim, and the NYCHRL's goal of "meld[ing] the broadest vision of social justice with the strongest law enforcement deterrent," Williams v. New York City Housing Authority, 61 A.D.3d 62, 68, 872 N.Y.S.2d 27, 32 (1st Dep't 2009) (quoting Craig Gurian, A Return to Eyes on the Prize: Litigating Under the Restored New York City Human Rights Law, 33 Fordham Urb. L. J. 255, 262 (2006)), summary judgment on the plaintiff's NYCHRL claim is denied.

     D.  Defamation

     "Under New York law, defamation is defined as 'the making of a false statement which tends to expose the plaintiff to public

contempt, ridicule, aversion or disgrace, or induce an evil opinion of him . . . .'" Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC, 813 F. Supp. 2d 489, 549 (S.D.N.Y. 2011) (alteration in original) (quoting Dillon v. City of New York, 261 A.D.2d 34, 37-38, 704 N.Y.S.2d 1, 5 (1st Dep't 1999)).  In New York, the elements of a slander claim are: (1) a defamatory statement of fact, (2) that is false, (3) published to a third party, (4) of and concerning the plaintiff, (5) made with the applicable level of fault on the speaker's part, (6) either causing special damages or constituting slander per se, (7) and not privileged.  Germain v. M & T Bank Corp., 111 F. Supp. 3d 506, 534 (S.D.N.Y. 2015) (quoting Albert v. Loksen, 239 F.3d 256, 265-66 (2d Cir. 2001)); see also Liberman v. Gelstein, 80 N.Y.2d 429, 434-35, 590 N.Y.S.2d 857, 860-61 (1992) (noting that slander "as a rule is not actionable unless the plaintiff suffers special damage" but that New York law recognizes certain "established exceptions").[16]

A statement constitutes slander per se (and therefore requires no proof of special damages) if it: (1) charges the plaintiff with a serious crime; (2) tends to injure the plaintiff

---

[16] Although the plaintiff characterizes her claim as one for libel, it is properly characterized as slander, as the alleged statement was published orally.  Albert, 239 F.3d at 265; Matthews v. Malkus, 377 F. Supp. 2d 350, 357 (S.D.N.Y. 2005).

in her trade, business, or profession; (3) accuses the plaintiff of having a loathsome disease; or (4) imputes unchastity to a woman.  <u>Sleepy's LLC v. Select Comfort Wholesale Corp.</u>, __ F. Supp. 3d __, __, 2015 WL 5599145, at *11 (E.D.N.Y. 2015).  Special damages "include the loss of something of economic value which must flow directly from the injury to reputation caused by the defamation."  <u>Daniels v. Alvarado</u>, No. 03 CV 5832, 2004 WL 502561, at *7 (E.D.N.Y. March 12, 2004).

The defendant argues that the plaintiff's defamation claims fail because the statements do not constitute defamation <u>per se</u> and there is no evidence that the plaintiff suffered special damages.  The statements at issue, published to Mr. Weinstein and Ms. Wolff respectively, are (1) that "[the plaintiff] was hearing voices and acting paranoid" (12/14/12 Case Note) and (2) that "[the defendant] could not afford to have students who hallucinate in class" (Wolff Letter).

The plaintiff appears to argue that Mr. Rochester's statements fall into the exception for statements that tend to injure another in his or her trade, business, or profession.  (Pl. Memo. at 23-25).  The defendant on the other hand asserts that the plaintiff's claim must fail because there is no evidence that "[a]t the time the [s]tatement[s] [were] made, plaintiff had [a] trade, occupation or business."  (Def. Memo. at 13).

40

To establish slander <u>per</u> <u>se</u> under this category, the plaintiff must prove that she carried on the trade, business, or profession at the time the statement was made and that the statement referenced her character or conduct in that profession.[17]   <u>Shakun v. Sadinoff</u>, 272 A.D. 721, 721-22, 74 N.Y.S.2d 556, 557 (1st Dep't 1947); <u>see also</u> <u>Gurtler v. Union Parts Manufacturing Co.</u>, 285 A.D. 643, 646, 140 N.Y.S.2d 254, 257-58 (1st Dep't 1955) ("[T]he words must be spoken in relation to the profession or trade.  It does not follow that any words spoken to the disparagement of a professional [] will ipso facto be actionable <u>per</u> <u>se</u>.").  In her deposition, the plaintiff clearly stated that she has not worked since 2005 and that she was not working when she attended Atelier. (Cain Dep. at 386).  Thus, a threshold issue is whether being a student in a vocational program constitutes a "trade, business, or profession."

The doctrine of presumed damages in defamation actions stems from "the experience and judgment of history that 'proof of actual damage will be impossible in a great many cases where, from the

---

[17] The plaintiff does not appear to argue (and in any case has offered no evidence to show) that she suffered special damages. Accordingly, her claim can only survive summary judgment if the alleged statements constitute slander <u>per</u> <u>se</u>.  <u>Lincoln First Bank of Rochester v. Siegel</u>, 60 A.D.2d 270, 280, 400 N.Y.S.2d 627, 633 (4th Dep't 1977) ("Where special damages are required but are not shown, summary judgment will lie.").

character of the defamatory words and the circumstances of publication, it is all but certain that serious harm has resulted in fact.'" Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc., 472 U.S. 749, 760 (1985) (quoting William Prosser, Law of Torts § 112 (4th ed. 1971)).  The Second Restatement of Torts suggests that the justification for presuming damages in the case of statements that tend to injure another in her trade, business, or profession, is that such statements are likely to affect one's commercial gains.  Restatement (Second) of Torts § 573 cmt. b (Am. Law Inst. 1977).  Extending this category to students, therefore, makes little sense.  While the plaintiff might have expected to earn a profit as an esthetician upon completion of the Atelier program, that prospect is too speculative to justify the presumption of damages.  TC v. Valley Central School District, 777 F. Supp. 2d 577, 603 (S.D.N.Y. 2011) (finding student's lost opportunity to complete ROTC program and become "a commissioned member of the armed forces is too attenuated to constitute an injury to [plaintiff's] trade or business that may come in the future"); cf. Knelman v. Middlebury College, 898 F. Supp. 2d 697, 726 (D. Vt. 2012) (noting that courts have recognized slander per se where "plaintiff was unemployed but had prior experience in the field and was seeking employment" and collecting cases).

Based on the evidence presented, the statements at issue do not constitute slander per se and the plaintiff has not established special damages.[18]   Accordingly, summary judgment is warranted as to the plaintiff's defamation claims.

Conclusion

For the foregoing reasons, the defendant's motion to amend the answer is denied and its motion for summary judgment (Docket No. 93) is granted in part and denied in part.   Specifically, summary judgment is granted in favor of the defendant as to the plaintiff's defamation claims and denied as to the plaintiff's discrimination claims under the Rehabilitation Act and the NYCHRL.

---

[18] As I noted in my October 29 Report and Recommendation, in Stern v. Cosby, 645 F. Supp. 2d 258 (S.D.N.Y. 2009), the court held that, under New York law, a statement constitutes libel per se "even if it does not fall within one of the four categories, if the statement is so severe that serious injury to the plaintiff's reputation can be presumed." Id. at 288-90; (10/29/14 R&R at 29-30).   However, with the exception of cases involving statements imputing homosexuality, see generally Yonaty v. Mincolla, 97 A.D.3d 141, 144, 945 N.Y.S.2d 774, 777 (3d Dep't 2012) (collecting cases and holding that such decisions "are inconsistent with current public policy and should no longer be followed"), I am not aware of any New York cases recognizing actions for slander per se beyond the established categories.   See Hinsdale v. Orange County Publications, Inc., 17 N.Y.2d 284, 288, 270 N.Y.S.2d 592, 596 (1966) ("Printed material is, because of the relative permanency of its impact, more readily held to be defamatory per se than are oral utterances of similar import."); Moore v. Francis, 121 N.Y. 199, 204 (1890) ("The authorities tend to support the proposition that spoken words imputing insanity are actionable, per se, when spoken of one in his trade or occupation, but not otherwise, without proof of special damage.").

SO ORDERED.

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

Dated:    New York, New York
          April 20, 2016

Copies mailed this date to:

Ileen Cain
66 Rockwell Place, Apt. 13H
Brooklyn, NY 11217

Nicole Feder, Esq.
Marian C. Rice, Esq.
L'Abbate, Balkan, Colavita & Contini, LLP
1001 Franklin Ave.
Garden City, NY 11530

44