```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -:
ILEEN CAIN,                         :    13 Civ. 7834 (JCF)
                                    :
              Plaintiff,            :
                                    :      OPINION AND
    - against -                     :        ORDER
                                    :
ATELIER ESTHETIQUE INSTITUTE OF     :
ESTHETICS, INC.,                    :
                                    :
              Defendant.            :
- - - - - - - - - - - - - - - - - -:
JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE
```

> USDS SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #: _____
> DATE FILED: 10/21/16

Ileen Cain, proceeding pro se, brings this action against Atelier Esthetique Institute of Esthetics, Inc. ("Atelier"). She alleges that the defendant violated Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794 et seq. ("Rehabilitation Act"), and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 et seq. ("NYCHRL") when it terminated her from its educational program.[1] A bench trial was held on four days between September 6 and September 16, 2016, and this opinion constitutes my findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

---

[1] A variety of other state and federal claims were previously dismissed. (Order of Service dated Nov. 26, 2013; Cain v. Atelier Esthetique Institute of Esthetics, Inc., No. 13 Civ. 7834, 2015 WL 1499810 (S.D.N.Y. March 27, 2015); Cain v. Atelier Esthetique, No. 13 Civ. 7834, 2016 WL 1599490 (S.D.N.Y. April 20, 2016).

Background

Atelier is a school of esthetics, commonly referred to as a beauty school. Ileen Cain first applied for admission as a student in 2010 and was accepted, but she chose not to attend at that time. Ms. Cain applied again in 2012 and was again accepted, and this time she enrolled. She received tuition assistance from ACCES-VR,[2] an agency of the New York State Department of Education that provides job placement and training for persons with disabilities. Ms. Cain began the Atelier program late because of a personal issue and thereafter attended classes for approximately one week. She was terminated from the program involuntarily.

After her dismissal, Ms. Cain filed an administrative complaint with the Office for Civil Rights ("OCR") of the United States Department of Justice. OCR reached a resolution with Atelier pursuant to which Atelier refunded Ms. Cain's tuition. Thereafter, the plaintiff filed the instant action, contending, among other things, that she had been terminated because of a perceived disability. Additional facts will be discussed below in connection with the analysis of the evidence.

---

[2] At that time, ACCES-VR was known as VESID.

Statutory Framework

    A.   Rehabilitation Act

    The Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in . . . or be subjected to discrimination under any program or activity receiving Federal financial assistance."  29 U.S.C. § 794(a).  To state a prima facie claim under the Rehabilitation Act, a plaintiff must demonstrate: (1) that she is a qualified individual with a disability within the meaning of the statute; (2) that the defendant is subject to the Act; and (3) that she was denied the opportunity to participate in the defendant's services, programs, or activities, or was otherwise discriminated against by the defendant, by reason of her disability.  Harris v. Mills, 572 F.3d 66, 73-74 (2d Cir. 2009).

    A "qualified individual with a disability" is defined as an individual with a disability who "with or without reasonable modifications . . . meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by" the covered entity.  42 U.S.C. § 12131(2); see also McElwee v. County of Orange, 700 F.3d 635, 640 (2d Cir. 2012).  An individual may qualify as "disabled" by showing that she is "regarded as having" a disability.  42 U.S.C. § 12102(1)(C);

see also 29 U.S.C. § 705(9)(B) (incorporating definition of disability from the Americans with Disabilities Act, 42 U.S.C. § 12102); Zick v. Waterfront Commission of New York Harbor, No. 11 Civ. 5093, 2012 WL 4785703, at *5 (S.D.N.Y. Oct. 4, 2012).

A person is regarded as having a disability where she establishes that "she has been subjected to an action prohibited under [the statute] because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3)(A). A "mental impairment" under the relevant implementing regulations means "[a]ny mental or psychological disorder, such as an intellectual disability . . . , organic brain syndrome, emotional or mental illness, and specific learning disabilities." 29 C.F.R. § 1630.2(h)(2).

B. NYCHRL

Under the NYCHRL, it is an "unlawful discriminatory practice" for "any place or provider of public accommodation[,] [b]ecause of any person's actual or perceived . . . disability . . . [to] directly or indirectly[] [] refuse, withhold from or deny to such person . . . any of the accommodations, advantages, services, facilities or privileges [thereof]." N.Y.C. Admin. Code § 8-107(4)(a). The NYCHRL defines "provider of public accommodation" to mean "providers . . . of goods, services, facilities,

accommodations, advantages or privileges of any kind," and defines "disability" as "any physical, medical, mental or psychological impairment, or a history or record of such impairment." N.Y.C. Admin. Code § 8-102(9), (16)(a). It does not require a showing that a disability, perceived or actual, substantially limits a major life activity. Reilly v. Revlon, Inc., 620 F. Supp. 2d 524, 541 (S.D.N.Y. 2009).

Pursuant to the NYCHRL, entities such as Atelier are prohibited from denying "accommodations, advantages, services, facilities or privileges" to an individual because of a perceived disability. N.Y.C. Admin. Code § 8-107(4)(a). "[C]ourts must analyze NYCHRL claims separately and independently from any federal . . . claims." Mihalik v. Credit Agricole Cheuvreux North America, Inc., 715 F.3d 102, 109 (2d Cir. 2013). The NYCHRL creates a lower threshold for actionable conduct and must be construed liberally in favor of discrimination plaintiffs, meaning that a defendant may be liable under the NYCHRL but not under state or federal statutes. Id. at 109-13; see also Anderson v. Davis Polk & Wardwell LLP, 850 F. Supp. 2d 392, 404 (S.D.N.Y. 2012); Romanello v. Intesa Sanpaola, S.p.A., 22 N.Y.3d 881, 884-85, 976 N.Y.S.2d 426, 428 (2013). Moreover, in assessing claims brought under the NYCHRL, courts should view similar provisions under federal law as "a floor below which the [NYCHRL] cannot fall."

Local Civil Rights Restoration Act of 2005, N.Y.C. Local Law No. 85, § 1 (2005); see also Loeffler v. Staten Island University Hospital, 582 F.3d 268, 277-78 (2d Cir. 2009).

As under the Rehabilitation Act, in order to establish a claim under the NYCHRL, a plaintiff must show that "(1) she is a member of a protected class; (2) she was qualified to hold the position; (3) she was terminated from employment or suffered another adverse employment action; and (4) the discharge or other adverse action occurred under circumstances giving rise to an inference of discrimination." Forrest v. Jewish Guild for the Blind, 3 N.Y.3d 295, 305, 786 N.Y.S.2d 382, 390 (2004); accord Melman v. Montefiore Medical Center, 98 A.D. 3d 107, 113, 946 N.Y.S.2d 27, 31 (1st Dep't 2012).

Determination

Ms. Cain satisfies many of the elements for establishing a claim under both the Rehabilitation Act and the NYCHRL. There is no dispute, for example, that Atelier is an entity governed by both statutes. The plaintiff has qualifying disabilities, including Post-Traumatic Stress Disorder, Major Depressive Disorder, and Personality Disorder. (Exhs. 17, 21, 35).[3]

---

[3] Unless otherwise indicated, all references to exhibits refer to evidence received at trial.

Furthermore, she was perceived as displaying manifestations of disability. For example, Ronald Corey Rochester, who was Director of Atelier during the relevant period (Tr. at 165),[4] testified that he witnessed Ms. Cain talking to herself as if she were hallucinating. (Tr. at 181). Those observations are consistent with records of the International Center for Disabled, an organization that had provided her with psychological and social services, which state that she had experienced auditory hallucinations. (Tr. at 30-31, 44-45; Exh. 31).

There is also evidence that Ms. Cain was subjected to an adverse action because of a perceived disability. Dismissal from an educational program is plainly an adverse action. And, as the Second Circuit has held in the context of an employment discrimination claim under section 504, "[t]he causal relationship between disability and decision need not be direct, in that causation may be established if the disability caused conduct that, in turn, motivated the employer to discharge the employee." Sedor v. Frank, 42 F.3d 741, 746 (2d Cir. 1994); accord Husowitz v. Runyon, 942 F. Supp. 822, 832 (E.D.N.Y. 1996). Here, Mr. Rochester acknowledged that he discharged the plaintiff from Atelier because of behaviors that may have been attributable to mental illness:

---

[4] "Tr." refers to the trial transcript.

7

hallucinations, emotional outbursts, and persistent distractedness. (Tr. at 175, 180-81, 201-03). The issue of "pretext" therefore does not arise in this case, since Atelier does not contend that it discharged Ms. Cain for reasons independent of disability.[5]

The analysis must therefore turn to the issue of qualification. As the Second Circuit has observed, again in connection with an employment case,

> [t]he handicap and its consequences are distinguished for purposes of § 504 only in assessing whether or not the firing was discriminatory. If the consequences of the handicap are such that the employee is not qualified for the position, then a firing because of that handicap is not discriminatory, even though the firing is "solely by reason of" the handicap.

Teahan v. Metro-North Commuter Railroad Co., 951 F.2d 511, 516 (2d Cir. 1991). In other words, even if Ms. Cain was terminated for conduct related to her disability, Atelier is not liable under § 504 if that behavior demonstrated that she was unqualified to participate in the defendant's program.

---

[5] Indeed, in the context of mental illness, demonstrating a motive for an adverse action independent of disability can be particularly challenging. For example, if Atelier had terminated the plaintiff for failing grades, the argument could be made that her academic shortcomings were in turn attributable to her disability, a contention that would be implausible if her disability were, for example, an orthopedic anomaly.

8

The credible evidence clearly demonstrates that Ms. Cain was expelled because she was not qualified to continue in the program. Mr. Rochester, the Director, testified that he met with the plaintiff twice after she commenced classes. (Tr. at 173). Prior to the first meeting, students and teachers had advised Mr. Rochester that her classmates were having difficulty concentrating because Ms. Cain was making distracting comments. (Tr. at 174). She was apparently having trouble keeping up with the material, would ask questions after the class had moved on to other subject matter, and would "interject material that was not germane to the topic." (Tr. at 175). When Ms. Cain met with Mr. Rochester, she complained that other students were bullying her. (Tr. at 175-76). She alleged that when she had previously attended a program at Long Island University, the students there had bullied her, and she suspected that they had "gotten to" the students at Atelier. (Tr. at 176). The plaintiff also asserted that "she had experienced bullying in her housing, her neighbors were requesting that she do things or telling her things or other people talking about her." (Tr. at 176-78). Ms. Cain insisted that Mr. Rochester call the police, but she refused to identify any Atelier students who were purportedly harassing her. (Tr. at 176). When Mr. Rochester declined to contact the police, the plaintiff became "confrontational," "irate," and "threatening," and suggested that

whoever was responsible for the bullying had "gotten to" him as well. (Tr. at 178). As the meeting concluded, Ms. Cain stated, "I know how to handle this, I know what to do with people like this . . . ." (Tr. at 178). Mr. Rochester took this to mean that Ms. Cain was considering "physical confrontation or violence." (Tr. at 178-79).

Subsequent to this meeting, Mr. Rochester conducted an observation of one of Ms. Cain's classes. He noted that "[s]he was towards the back of the class, sitting a bit glazed, not really relating to the class, not taking notes, not reading. She was glazed." (Tr. at 180-81). He also observed her in the hallway "talking and seeming to respond when no one was there. . . . She was scowling, angry, almost having an argument with herself." (Tr. at 181).

Mr. Rochester also spoke with Ms. Cain's teachers about her conduct. One, Christine Anderson, told him that Ms. Cain

> was making comments that weren't really related to esthetics out of nowhere, that she didn't seem to be following the material. At times, she was very active in saying things and at times seemed not able to -- not relating to the classroom at all. At times, looking at the other students and not taking notes.

(Tr. at 182).

On the day of her dismissal, Mr. Rochester met with Ms. Cain and told her that when he had observed her class he had not seen

10

evidence of bullying, and he tried to suggest ways for her to adjust to the program. (Tr. at 183). Although Ms. Cain was initially calm, she "became agitated, threatening, aggressive." (Tr. at 183). When Mr. Rochester did not respond to Ms. Cain's demand that he call the police, she stormed out. (Tr. at 184). Mr. Rochester contacted ACCES-VR and told a supervisor about his observations. (Tr. at 184-85). The supervisor suggested that Ms. Cain be referred back to the agency. (Tr. at 185). Mr. Rochester, accompanied by Ann Pandullo, the financial aid officer for Atelier, then met again with Ms. Cain. (Tr. at 185). At that point, he terminated Ms. Cain from the school. (Tr. at 186).

Ms. Anderson, one of Ms. Cain's instructors, also testified. She remembered little of her interactions with Ms. Cain with one notable exception. On the day that Ms. Cain was dismissed, some of Ms. Anderson's students reported to her that the plaintiff had "threatened other students by saying she was going to do the same thing that the Sandy Hook shooter did to the students at Atelier, and that she would have done it better than the Sandy Hook shooter." (Tr. at 280-81, 284). Ms. Anderson informed Mr. Rochester of this behavior, though apparently after he had already dismissed Ms. Cain. (Tr. at 280-81).

By contrast to the evidence presented by the defendant's witnesses, Ms. Cain's testimony was not credible. She continued

to make implausible claims of being harassed and "cyberstalked." (Tr. at 18). When asked how she knew she was being cyberstalked, she said,

> Because I'm continuously being harassed at different places that I appear. For example, you know that I have been terminated from four schools of higher learning. Over the past several years I'm constantly being bombarded, harassed by different individuals who I don't even know . . . . I have been accused of things I have never done. People appear to know me and I don't know them in institutions of higher learning where I have attended.

(Tr. at 20-21). When asked to define "cyberstalking," Ms. Cain stated:

> Cyberstalking is a form of electronic harassment used by social media. It's something that individuals use to target an individual by posting comments about that person, making lies, telling lies about the person, changing the person's character, the person's identity. This is used during social media. It's something that is instantaneous. It's something that reaches the four corners of the population, the entire world. It is a form of electronic harassment as opposed to the common stalker which is more in person, someone who is actually physically tracking you or stalking you.

(Tr. at 21). Although she has never participated in social media, Ms. Cain insisted that the students at Atelier were cyberstalking her and referring to her using a number of incomprehensible epithets. (Tr. at 22-23).

Education professionals are entitled to deference in determining whether an individual is qualified to participate in an academic program. See Powell v. National Board of Medical

Examiners, 364 F.3d 79, 88 (2d Cir. 2004); Roggenbach v. Touro College of Osteopathic Medicine, 7 F. Supp. 3d 338, 345-46 (S.D.N.Y. 2014). In this context, "deference must be paid to the evaluation made by the institution itself, absent proof that its standards and its application of them serve no purpose other than to deny an education to handicapped persons." Doe v. New York University, 666 F.2d 761, 776 (2d Cir. 1981), superseded on other grounds by Zervis v. Verizon New York, Inc., 252 F.3d 163 (2d Cir. 2001). Based on his personal observations as well as credible information he had received from others, Mr. Rochester's decision to terminate the plaintiff from Atelier was a rational one and was not based on discriminatory animus. Plainly, Ms. Cain appears to suffer from delusions, and although these may be manifestations of her mental disabilities, they resulted in behaviors that rendered her unqualified to participate in Atelier's educational program. A student who "tunes out" in class, who disrupts instruction by interjecting comments that are off-point, who makes unsubstantiated complaints of harassment about her classmates, and who becomes hostile when she believes that those complaints are not properly addressed is not qualified to continue in an academic environment.[6]

---

[6] As discussed above, this analysis is premised on the finding that Ms. Cain's behavior was a manifestation of her disability.

Thus, Mr. Rochester's dismissal of Ms. Cain was lawful based on the information he had at the time he made the decision. And his judgment was confirmed by the information he subsequently learned from Ms. Anderson about Ms. Cain's comments alluding to the Sandy Hook massacre. In the context of most antidiscrimination laws, after-acquired evidence may be used to cut off damages after the point the information is learned, but it does not operate to relieve a defendant from all liability. See McKennon v. Nashville Banner Publishing Co., 513 U.S. 352, 358, 361-62 (1995). With respect to laws prohibiting discrimination on the basis of disability, the analysis may be more subtle. To the extent that the after-acquired evidence is independent of disability, the general rule applies. For example, an employee who is terminated because she has a seizure disorder would not be barred from all recovery if it is later discovered that she committed misconduct by violating her employer's policy governing computer use; she would, however, be precluded from obtaining front pay or similar relief for the period after her misconduct is discovered. See Rooney v. Koch Air, LLC, 410 F.3d 376, 382 (7th Cir. 2005) (limiting remedies but not precluding liability where truck driver

---

If that were not the case, the outcome would be the same, though the analysis would be different. If the conduct at issue were independent of Ms. Cain's disability, then her disability would not have been the sole reason for her dismissal.

14

alleging discrimination based on disability found not to have driver's license); <u>Williamson v. Ball Healthcare Services, Inc.</u>, Civ. A. No. 14-552, 2016 WL 4257554, at *7-9 (S.D. Ala. Aug. 11, 2016) (limiting remedies but allowing claim to proceed where it is later discovered that disability plaintiff made misleading and incomplete statements in employment application process); <u>Seegert v. Monson Trucking, Inc.</u>, 717 F. Supp. 2d 863, 869-70 (D. Minn. 2010) (holding disability claim not entirely precluded where plaintiff found to have made false statements about health history at time of employment application).

But where the after-acquired evidence does relate to the plaintiff's disability, some courts hold that it may preclude a finding of liability altogether.  This is because such evidence may demonstrate that a plaintiff is not "otherwise qualified": the "[p]laintiff bears the burden of proving qualifications, without reference to knowledge by the defendant, and [the] defendant may use any otherwise admissible evidence to undercut this proof." <u>E.E.O.C. v. Fargo Assembly Co.</u>, 142 F. Supp. 2d 1160, 1164-65 (D.N.D. 2000).  I need not determine, however, whether this exception to general principle governing after-acquired evidence is warranted.  The information actually known to Mr. Rochester when he made the decision to dismiss Ms. Cain was fully sufficient

15

to demonstrate that she was not qualified to continue in Atelier's course of study.[7]

Conclusion

For the reasons discussed above, judgment shall be entered in favor of the defendant, dismissing the plaintiff's remaining claims.

SO ORDERED.

*James C. Francis IV*

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

Dated: New York, New York
October 21, 2016

Copies mailed this date to:

Ileen Cain
66 Rockwell Place, Apt. 13H
Brooklyn, NY 11217

Nicole Feder, Esq.
Marian C. Rice, Esq.
L'Abbate, Balkan, Colavita & Contini, LLP
1001 Franklin Ave.
Garden City, NY 11530

---

[7] The impact of the after-acquired evidence rule on this case would be minimal in any event. Because Ms. Cain's threatening comments about Sandy Hook came to light immediately after she had been terminated, the only practical effect of a finding that Mr. Rochester's initial decision had been improper would be to create an entitlement for Ms. Cain to nominal damages and, had she been represented by counsel, to an award of attorneys' fees.